IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

WILLIAM MANUEL DURAN, and
DEBORAH DURAN

      Plaintiffs,

v.

CITY OF PUEBLO, COLORADO,
JACKI TORRES,
ANTOINETTE RAMOS, and
GLEN FILLMORE,

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

# INTRODUCTION

1) This is an action arising under the Constitution of the United States, particularly the Fourth Amendment of the Constitution of the United States and under federal law, particularly Title 42 of the United States Code, § 1983, § 1988, alleging the violation of Plaintiffs' constitutional, civil and human rights while being detained and/or arrested by Pueblo Police while a search warrant for evidence was executed at 1002 Bohmen Avenue in Pueblo Colorado. The actions of the defendants showed a highly reckless indifference to the constitutional rights of Plaintiffs. Plaintiff William Duran was severely

injured and his life was placed in jeopardy when Defendants, acting under the color of state law, acted unreasonably considering the facts known and available to them, used an excessive amount of force to detain Plaintiffs, ignored Plaintiff William Duran's medical condition and his disability, and detained and/or arrested Plaintiffs without probable cause or an arrest warrant. Defendants' actions were premeditated and without justification or excuse. The actions of the defendants, both jointly and severally, were the proximate cause of Plaintiff William Duran suffering irreparable physical harm and both Plaintiffs being deprived of their constitutional rights.

## JURISDICTION AND VENUE

2) This action arises under the Fourth Amendment to the United States Constitution and under the Civil Rights Act of 1871, 42 U.S.C. §§1983 and 1988.

3) Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343(3) in that the controversy arises under the United States Constitution and under 42 U.S.C. §1983. This Court has authority to award attorneys fees pursuant to 42 U.S.C. §1988.

4) Venue is proper under 28 U.S.C. §1391 in that all events alleged in this complaint occurred within the Federal District of Colorado.

## THE PARTIES

5) US Army Sergeant First Class William Duran (Ret.) (Plaintiff William Duran) is a native and permanent resident of the State of Colorado.

6) Plaintiff Deborah Duran is a native and permanent resident of the State of Colorado.

7) Plaintiffs are husband and wife.

8) Defendant City of Pueblo, Colorado (after this, referred to as "the City," or "Defendant City") is a municipal corporation organized under Article XX of the Constitution of the State of Colorado and as such is a "person" subject to suit within the meaning of 42 U.S.C. §1983.

9) Defendant Jackie Torres is and was at all times material to this Complaint an officer with the City of Pueblo, Colorado Police Department, acting under the color of law.

10) Defendant Antoinette Ramos is and was at all times material to this Complaint a detective with the City of Pueblo, Colorado Police Department, acting under the color of law.

11) Defendant Glen Fillmore is and was at all times material to this Complaint a detective with the City of Pueblo, Colorado Police Department, acting under the color of law.

## STATEMENT OF FACTS

### The Search and Seizures

12) Plaintiff William Duran is an honorably discharged U.S. Army veteran with 21.5 years of service in the Army.

11) Plaintiff William Duran is disabled, has a history of back injuries, and prior to September 18, 2015 he had undergone back surgery.

12) Plaintiff William Duran was 60 years old on September 18, 2015 (DOB 01-11-1955).

13) Plaintiffs moved into their home at 1002 Bohmen Avenue, Pueblo Colorado on August 28, 2015.

14) The home at 1002 Bohmen Avenue sits at the corner of Bohmen Avenue and Arroyo Ave.

15) Before the Durans moved into 1002 Bohmen Avenue, Timothy Tafoya (DOB 12-16-1993) a known gang member, and his family lived, at 1002 Bohmen Avenue.

16) Timothy Tafoya and his family were evicted from 1002 Bohmen Avenue on or about July 28, 2015.

17) Upon information and belief, officers of the Pueblo Police Department stood by and observed the eviction of the Tafoyas from 1002 Bohmen Avenue on or about July 28, 2015.[1]

18) Upon information and belief, there was knowledge within the Pueblo Police Department that the home at 1002 Bohmen Avenue was probably a rental on September 18, 2015 since it has been a rental on July 28, 2015 when the Tafoya family was evicted therefrom in the presence of members of the Pueblo Police Department.[2]

19) Puebloan Ricky Muniz was murdered on or about September 14, 2015.

20) Shortly before Mr. Muniz was murdered, he confronted Mr. Tafoya and another man who were spray painting his residence.

21) Mr. Tafoya shot and killed Mr. Muniz when Mr. Muniz confronted him and the other man.

---

[1] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

[2] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

22) Upon information and belief, Timothy Tafoya was over the age of 18 years on September 14, 2015.

23) Pueblo Police had identified Mr. Tafoya as a "person of interest" in the murder of Mr. Muniz by September 15, 2015 and had photographic identification of Mr. Tafoya since he was previously known to the Pueblo Police Department.

24) On September 18, 2015, several search warrants were signed to search for evidence related to the murder of Ricky Muniz which might implicate Mr. Tafoya, including a warrant to search for evidence at 1002 Bohmen Avenue. The warrant is attached as Exhibit 1 and is referred to after this as "the search warrant" or "search warrant."

25) The search warrant was officially related to a Pueblo Police Department investigation into a criminal mischief case for gang graffiti.

26)  Police suspected that Mr. Muniz's shooter was involved in spraying graffiti on Mr. Muniz's residence when Mr. Muniz was shot and killed.

27) The search warrant, on its face, did include a search for evidence related to the murder of Mr. Muniz.

28) The search warrant did not mention anything about the search being related to a specific crime, instance of violence, drugs or drug use, or contraband, and did not specifically state that evidence related to a murder investigation was being sought.

29) The search warrant was issued without an endorsement for police to search for property which was "illegal to possess."

30) The warrant specified that the property at 1002 Bohmen Avenue was to be

searched for:

> Graffiti implements including but not limited to spray paint, spray paint
> nozzles, indelible markers, paint sticks, etching equipment, or any other
> device capable of leaving a visible mark. Any DNA or trace evidence.
> Gang paraphernalia including but not limited to bandannas, clothing with
> gang insignia, gang writings/ graffiti, photographs, and any other item
> related to criminal street gangs. Clothing to include light and dark colored,
> hats, shoes, including but not limited to black Nike shoes. Any storage
> device capable of storing and capturing photographs and messages
> including but not limited to mobile phones, digital storage devices,
> computers, smart tablets and game consoles. Jewelry including but not
> limited to a larger rope type necklace. Any documents including but not
> limited to receipts or documents relating to graffiti implements and gang
> paraphernalia.

31) The search warrant did not state that items at 1002 Bohmen Avenue to be

searched for under the warrant were contraband or illegal to possess.

32) As of September 18, 2015, it was not illegal for any person over the age of 18

years to possess "graffiti implements."

33) As of September 18, 2015, it was a Class 1 municipal offense to apply graffiti

on certain surfaces of certain types of property. See Pueblo City Code, 11-9-3.

34) As of September 18, 2015, the punishment for an adult convicted of a Class

1 municipal offense was "a fine of not more than one thousand dollars

($1,000.00) or imprisonment for not more than one (1) year, or both such fine

and imprisonment." See Pueblo City Code, 11-1-103.

35) The search warrant did not list "deadly weapons" or "firearms" as being

included objects of the search warrant.

36) Although not stated in the search warrant, Mr. Tafoya was essentially the target of

the search warrant.

37) On its face, the search warrant was intended to find evidence of a crime.

38) The search warrant for evidence was issued for 1002 Bohmen Avenue because

Timothy Tafoya was previously listed as a resident there by Rocky Mountain Offender

Management Systems (after this, RMOMs), an organization that uses ankle monitors to

track and monitor individuals on probation.[3]

39) Upon information and belief, Mr. Tafoya was wearing an ankle monitor at the time

he murdered Mr. Muniz.[4]

40) Upon information and belief, Pueblo Police were told by RMOMs that Mr. Tafoyahad

been by 1002 Bohmen Avenue sometime before 5 pm on September 18, 2015.

41) Upon information and belief, despite Mr. Tafoya having previously listed his

residence address as 1002 Bohmen Avenue, RMOMs knew that Mr. Tafoya was not a

resident at that location on September 18, 2015, because Mr. Tafoya did not have a

regular, continuous, or adequate monitored presence at 1002 Bohmen Avenue.[5]

42) Prior to the search warrant being executed, Pueblo police officers involved in

executing the search warrant were briefed about the details of the case and given

assignments for the execution of the search warrant.

---

[3] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[4] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[5] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

43) Upon information and belief, Pueblo police officers involved in executing the search
warrant at 1002 Bohmen Avenue had been briefed as to why the search warrant was
issued, and at no time during this briefing were those police officers involved in the
search warrant informed:[6]

   a) That an arrest warrant for either Plaintiff William Duran or Plaintiff Deborah Duran
was being served;

   b) That Plaintiff William Duran or Plaintiff Deborah Duran were the object of the
search warrant;

   c) That Plaintiff William Duran or Plaintiff Deborah Duran were armed and
dangerous;

   d) That Plaintiff William Duran or Plaintiff Deborah Duran posed a threat to the
safety of the public or the police; or

   e) That the search was for contraband or illegal possession.

44) The search warrant did not mention or specify anything related to Plaintiffs.

45) There was no arrest warrant which was being executed along with the search
warrant.

46) Defendant Glen Fillmore was the detective in charge of executing the search
warrant.

---

[6] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

47) All Pueblo police officers involved in the search warrant being served at 1002 Bohmen Avenue were under the direction, control and supervision of Defendant Fillmore.

48) Before the execution of the search warrant, Defendant Fillmore and/or other officers and/or the Chief of Police of the Pueblo Police Department made the decision to involve the Pueblo Police Department's S.W.A.T. unit in the execution of the search warrant.[7]

49) The decision to use a S.W.A.T. unit in the execution of the search warrant constituted a determination by the decision maker(s) regarding the degree of force initially to be applied in effecting the execution of the search warrant and the seizure itself.[8]

50) Before the execution of the search warrant, police officers involved in its execution were given a physical description of Timothy Tafoya, including his physical characteristics and his age, and knew what he looked like from Pueblo Police Dept. records, including photographs on file of Timothy Tafoya.[9]

51) Upon information and belief, Defendant Fillmore had a photograph of Timothy Tafoya with him at the time that the search warrant was executed.[10]

---

[7] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[8] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[9] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[10] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

52) Upon information and belief, one or more officers of the Pueblo Police Dept. had
1002 Bohmen Ave. under surveillance since at least 9 a.m. on September 18, 2015.[11]

53) Upon information and belief, the officers saw Timothy Tafoya outside of 1002
Bohmen Avenue.

54) Upon information and belief, the officers who saw Timothy Tafoya outside 1002
Bohmen Avenue during the surveillance operation did not see Timothy Tafoya enter into
or leave from 1002 Bohmen.[12]

55) On September 18, 2016, the search warrant was executed by a Pueblo Police Dept.
S.W.A.T. unit andother police forces sometime between 5pm and 5:45pm.

56) Upon information and belief, Pueblo police had access to ankle monitoring data
which would have told them, had they looked, whether Mr. Tafoya was at 1002 Bohmen
Avenue when the search warrant was executed and Pueblo police knew or should have
known that Mr. Tafoya was not at 1002 Bohmen Avenue when the search warrant was
executed.[13]

57) On September 18, 2015, sometime between 5pm and 5:45 pm, Plaintiff William
Duran heard his dogs barking in the front room of his house. He looked out a window
and noticed a line of cars on Arroyo Street.

58) Then, Plaintiff William Duran went to another window in his house and noticed there
were no longer any cars on Arroyo St.

---

[11] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).
[12] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).
[13] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

59) Then, Plaintiff William Duran went to the front room to get a good look out the front room window and he noticed a big black vehicle that appeared to him as if it had struck his truck that was parked in front of his house on Bohmen Avenue.

60) Unbeknownst to Plaintiffs, a Pueblo S.W.A.T. unit in a tactical vehicle along with several other Pueblo police officers and Pueblo police detectives surrounded Plaintiffs' home with their vehicles.

61) Numerous S.W.A.T. unit members and Pueblo police officers, totaling approximately one dozen armed officers, surrounded the home and drew guns on the home.

62) Then, Plaintiff William Duran opened his front door to go out on the front porch, and saw the S.W.A.T. team at his front gate with all their weapons pointed at him and his wife and he heard shouts of "get your hands up."

63) Plaintiff William Duran did not know why a S.W.A.T. team was outside of his house with weapons trained on him and his wife, but he immediately put his hands up in the air and said, "what the hell?"

64) Plaintiff William Duran was concerned that his dogs would exit the house and get shot by the police officers, so he told them that he was coming out of the house through the back door (which is really a side door to his house, relative to the front door) and for them to meet him there.

65) Plaintiff Deborah Duran was able to control the dogs and keep them inside while her husband went to the back door.

66) Plaintiff William Duran exited the back door with his hands up, was told by a S.W.A.T. member to keep his hands up and to back up to his voice.

67) Plaintiff William Duran did what he was told, kept his hands up and started to back up to the voice.

68) Plaintiff William Duran felt what he thought must have been the barrel of a firearm at the back of his head and stopped backing up.

69) Plaintiff William Duran was then handcuffed with his hands behind his back and lead out through the front gate to where the other officers were located.

70) Plaintiff William Duran was then turned over to Defendant Jacki Torres.

71) Plaintiff Deborah Duran also exited the home and was handcuffed.

72) Defendant Torres or Defendant Ramos handcuffed Plaintiff Deborah Duran.

73) When Pueblo police came to Plaintiffs' home and executed the search warrant, they did not have probable cause to arrest, detain or search Plaintiffs.

74) The Pueblo Police knew upon having visual contact with Plaintiff William Duran that he was "obviously" not Timothy Tafoya, as Plaintiff William Duran and Timothy Tafoya do not look alike and are not even in the same age range.[14]

75) Upon seeing Plaintiff William Duran, Defendant Torres knew that he was not Timothy Tafoya, the target of the investigation.

76) At the moment of visual contact with Plaintiff William Duran, the Pueblo police officers at the scene had no information connecting Plaintiffs to the murder of Mr. Muniz.

---

[14] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

Page 12

77) Police officers at 1002 Bohmen Avenue did not recognize Plaintiffs and had no reason to believe that either one of them had committed, was committing, or was about to commit any offense under state or federal law.

78) Plaintiffs made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers.

79) Police officers executing the search warrant for evidence knew nothing about Plaintiffs other than they were present inside and then outside the home at 1002 Bohmen Avenue when the warrant was executed.

80) There was nothing in the search warrant which indicated that Plaintiffs may be a threat to the public or the police.

81) There was no reasonable suspicion that either plaintiff posed a threat to officers or the public.

82) At no time during the execution of the search warrant did police officers develop probable cause to arrest either plaintiff.

83) At no time during the execution of the search warrant did police officers develop an articulable and reasonable suspicion that would justify an investigative detention of either plaintiff.

84) At no time during the execution of the search warrant did police officers develop an articulable and reasonable suspicion that either plaintiff was armed with a weapon.

85) Pueblo Police did not have reasonable suspicion that either plaintiff had committed any crime.

86)  At no time did Plaintiffs make any threatening physical moves towards any of the police officers.

87) At no time did Plaintiffs make any threatening verbal remarks to any of the Pueblo police officers.

88) At no time did Plaintiffs attempt to evade any of the Pueblo police officers.

89) At no time did Plaintiffs do or say anything which would cause any of the police officers to believe that they were being anything other than compliant with police demands.

90) In fact, Plaintiffs complied with all demands the police officers gave to them.

91) Plaintiffs were frisked for weapons by the officers.

92) The decision to use the S.W.A.T. unit in the execution of the search warrant constituted an objectively unreasonable decision that resulted in an objectively unreasonable use of force because:

    a)  The Pueblo Police Department knew that Timothy Tafoya had been evicted from 1002 Bohmen on July 28, 2015;

    b)  Based on what the Pueblo Police Department knew regarding the homicide of Ricky Muniz and the likely suspect, a reasonable person would have concluded that it was likely that non-suspects in Mr. Muniz's homicide resided at 1002 Bohmen Avenue on September 18, 2015;

c) The Pueblo Police Department failed to check with the owner of 1002 Bohmen Avenue to determine the identity of the renter or renters at 1002 Bohmen Avenue as of September 18, 2015;[15]

d) The items sought for in the warrant were not contraband or illegal to possess; at most, the active use of graffiti implements in applying graffiti to certain surfaces of certain types of property was a Class 1 municipal offense; and,

e) The Pueblo Police Department failed to check with RMOMs before raiding 1002 Bohmen for the whereabouts of Timothy Tafoya and whether his ankle monitor showed him to be at or near 1002 Bohmen Avenue.[16]

93) The actual use of the S.W.A.T. unit in the execution of the search warrant, including but not limited to the S.W.A.T. unit member placing a firearm to the back of Plaintiff William Duran's neck, constituted an objectively unreasonable use of forcebecause:

a) The Pueblo Police Department knew that Timothy Tafoya had been evicted from 1002 Bohmen on July 28, 2015;

b) Based on what the Pueblo Police Department knew regarding the homicide of Ricky Muniz and the likely suspect, a reasonable person would have concluded that it was likely that non-suspects in Mr. Muniz's homicide resided at 1002 Bohmen Avenue on September 18, 2015;

---

[15] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[16] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

c) The Pueblo Police Department failed to check with the owner of 1002 Bohmen Avenue to determine the identity of the renter or renters at 1002 Bohmen Avenue as of September 18, 2015;[17]

d) The items sought for in the warrant were not contraband or illegal to possess; at most, the active use of graffiti implements in applying graffiti to certain surfaces of certain types of property was a Class 1 municipal offense;

e) The Pueblo Police Department failed to check with RMOMs before raiding 1002 Bohmen for the whereabouts of Timothy Tafoya and whether his ankle monitor showed him to be at 1002 Bohmen;[18] and,

f) The officers participating in the raid of 1002 Bohmen Avenue would have or should have recognized immediately upon the Plaintiffs coming into their view that they were not Timothy Tafoya and hence were not suspects in the murder of Ricky Muniz.

94) The arrest and/or detention of each Plaintiff, incidental to the execution of a search warrant for evidence, and without cause or suspicion of them being involved in any illegal activity, was unconstitutional and violated each of their Fourth Amendment rights.

95) The frisk of each Plaintiff, incidental to the execution of a search warrant for evidence, was unconstitutional and violated each of their Fourth Amendment rights.

---

[17] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[18] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

96) When Plaintiff William Duran was turned over to Defendant Jacki Torres, she swung him around, lifted upward on the handcuffs, and forced him to bend over by pushing down on his arms and back.

97) Plaintiff William Duran started screaming "My back! My back! I'm disabled!", but Defendant Jacki Torres kept him in the forced position and walked him some distance to an SUV, while he was screaming in pain.

98) Then, Defendant Jacki Torres pushed Plaintiff William Duran into the back of the police SUV.

99) Defendant Torres' use of force on Plaintiff William Duran was an objectively unreasonable use of force.

100) The forced position which Defendant Torres placed Plaintiff William Duran into caused him extreme pain and irreparable damage to his surgically repaired back.

101) Despite Defendant Torres' use of force on Plaintiff William Duran, he remained compliant and peaceful.

102) Plaintiff Deborah Duran was also handcuffed, and detained without probable cause, reasonable suspicion, or under an arrest warrant, but was not forced into the same position to which Defendant Torres had forced her husband.

103) Plaintiff Deborah Duran was detained without the use of excessive force, except for the decision to use, and the use of, the S.W.A.T. unit in the raid, in contrast to the way in which Defendant Torres treated her husband once he was detained.

104) After approximately 10 minutes in the police vehicle, Plaintiff William Duran was removed from the vehicle by Detective Fillmore and uncuffed after being patted down for weapons.

105) Detective Fillmore told Plaintiffs, "obviously you are not the people we are looking for."

106) Through his actions as the supervising officer of the team executing the search warrant, Defendant Fillmore showed a reckless indifference towards the behavior of his subordinates, specifically Defendant Torres, when Defendant Fillmore did not know of the actions of Defendant Torres, and/or expressly or implicitly approved of the the actions of Defendant Torres, and/or adopted the actions of Defendant Torres.

107) Per Defendant Fillmore's report, he informed Plaintiff William Duran that "the police have to operate at the highest level of officer safety when we serve search warrants for locations where we feel there is a very high danger level." (After this, referred to as "the statement").

108) Plaintiff William Duran denies that Defendant Fillmore made the statement to him.

109) The statement was a false statement and was a blatant attempt by Detective Fillmore to qualify, excuse and diminish the violation of Plaintiffs' constitutional rights at the hands of Defendant Fillmore and his subordinates.

110) The statement constituted a cover-up of the unlawful seizure of Plaintiff William Duran.

111) The statement constituted a cover-up of Defendant Torres' unlawful use of excessive force against Plaintiff William Duran, and hence a ratification by Defendant Fillmore of Defendant Jacki Torres's actions towards Plaintiff William Duran.

112) The statement constituted a cover-up of the illegal use of excessive force against, and illegal seizure of, Plaintiff William Duran from the decision to use, and the actual use of, the S.W.A.T. unit, and hence a ratification by Defendant Fillmore of the decision to use and the actual use of the S.W.A.T. unit.

113) The statement constituted a cover-up of the illegal use of excessive force against, and illegal seizure of, Plaintiff Deborah Duran from the decision to use, and the actual use of, the S.W.A.T. unit, and hence a ratification by Defendant Fillmore of the decision to use and the actual use of the S.W.A.T. unit.

114) The statement constituted a cover-up of the unlawful use of force against and unlawful seizure of Plaintiff Deborah Duran, and hence a ratification by Defendant Fillmore of the actions taken towards Plaintiff Deborah Duran in handcuffing her.

115) The actions of the S.W.AT. unit in participating in the execution of the search warrant were expressly or implicitly authorized and/or adopted by Defendant Fillmore.

116) The actions of the police on September 18, 2015 toward Plaintiffs while executing the search warrant at 1002 Bohmen Ave., including but not limited to the decision to use, and the use of, the S.W.A.T. unit, and the statement, show that the Pueblo Police Department had an accepted custom or practice that when the police possess a warrant to search premises for evidence rather than contraband, they are justified by reasons of officer safety to use a S.W.A.T. unit and to search or pat-down non-suspects found on

the premises regardless of whether the police have a reasonable suspicion that the

person is or was involved in any criminal activity or that he or she possesses

contraband

117) Even if Defendant Fillmore had made said the statement, the search of 1002

Bohmen Avenue was not an inherently dangerous situation justifying the detention of

either Plaintiff.

118) Even if Defendant Fillmore had made the statement, the detention of either Plaintiff

during the search of 1002 Bohmen Avenue was not justified since the search was not

for seizing contraband.

119) Even if Defendant Fillmore had made the statement, it shows an intent by him to

disregard clearly established constitutional law.

120) Defendant Fillmore expressly or implicitly directed the actions of Defendant Torres

and/or Defendant Ramos during the execution of the search warrant for evidence, and

Defendant Fillmore's subsequent actions validating the actions of Defendant Torres

and/or Defendant Ramos showed that Defendant Fillmore also disregarded Plaintiffs'

safety and constitutional rights.

121) The actions of Defendant Torres and/or Defendant Ramos were done under the

direct supervision of Defendant Fillmore serving as their superior and the officer in

charge of executing the search warrant.

122) Defendant Torres, having knowledge that she was involved in the execution of a

search warrant for evidence, that Plaintiff William Duran was not Mr. Tafoya, that

Plaintiff William Duran was disabled with a back problem, and that Plaintiff William

Duran posed no threat once handcuffed, acted unreasonably considering the
circumstances and used excessive force on Plaintiff William Duran after he had
peacefully submitted to (but not consented to) being arrested and/or detained by the
Pueblo Police.

123) This excessive use of force by Defendant Torres on Plaintiff William Duran has
caused him to undergo several medical procedures.

124) As a direct result of the actions by Defendant Torres using excessive force on a
peaceful and compliant Plaintiff William Duran, actions which were taken under the
direct supervision and direction of Defendant Fillmore, Plaintiff William Duran suffered
irreparable harm from a deterioration of his back, including a fragmentation of his
vertebrae.

125)  As a direct result of the actions by Pueblo police officers in arresting and/or
detaining Plaintiff William Duran, the actions of Defendant Torres in using excessive
force on a peaceful and compliant Plaintiff William Duran, and the actions taken by
Defendant Torres under the direct supervision and direction of Defendant Fillmore, and
or Defendant Fillmore's express or implicit authorization of such force, Plaintiff William
Duran was denied his constitutional rights under the Fourth Amendment.

126) Defendant Fillmore falsified his case report when he stated that Plaintiff William
Duran "never complained to me about his back hurting or about the way he was treated
or handled," given Defendant Fillmore's earlier statement in his report that "William told
me he has a bad back."

127) The fact that Defendant Fillmore felt it necessary to note that Plaintiff William Duran never complained to him about his back hurting or about the way he was treated or handled in contradiction to his previous statement in his report that Plaintiff William Duran informed Defendant Fillmore he had a "bad back," is inconsistent with not only the record, but with eyewitness accounts, and such a statement shows an intent by Defendant Fillmore to cover-up, acquiesce in, or otherwise authorize and/or adopt, the unconstitutional actions of Defendant Torres with regard to Plaintiff William Duran while she was under his direct supervision.

128) These actions and statements of Defendant Fillmore to Plaintiff William Duran show a callous indifference to the rights of Plaintiff William Duran.

129) Upon information and belief, it was predetermined by Defendant Fillmore and the Pueblo police executing the search warrant for evidence at 1002 Bohmen Avenue, that any occupants of 1002 Bohmen Avenue would be arrested and/or detained regardless of the facts discovered at 1002 Bohmen Avenue.[19]

130) Even if Defendant Fillmore did not know of the excessive use of force used by Defendant Torres against Plaintiff William Duran, Defendant Fillmore as the supervisor of the Pueblo Police Team which was executing the warrant on 1002 Bohmen Avenue, showed a callous indifference to the constitutional rights of Plaintiff William Duran by failing to know what his subordinates were doing and by falsifying his report about whether Plaintiff William Duran told him he had a bad back.

---

[19] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

131) Even if Defendant Fillmore did not know of the unconstitutional arrest and/or detention of Plaintiff Deborah Duran, Defendant Fillmore as the supervisor of the Pueblo Police Team, including Defendants Torres and/or Ramos, which was executing the warrant on 1002 Bohmen Avenue, showed a callous indifference to the constitutional rights of Plaintiff Deborah Duran by failing to know what his subordinates were doing.

132) Defendants Torres, Ramos and Fillmore were on notice as to there being a reasonableness standard for their actions while acting under the color of state law.

133) Defendants Torres, Ramos and Fillmore were on notice of the constitutional requirements of police officers in executing a search warrant for evidence.

134) The excessive use of force by Defendant Torres upon Plaintiff William Duran was unreasonable under the circumstances because:

   a) The police force including Defendant Torres and Defendant Fillmore had already identified Mr. Tafoya as a "person of interest," had him under surveillance, and could monitor his location electronically through an ankle monitor Mr. Tafoya was wearing;

   b) Plaintiff William Duran was clearly not the suspect which the search warrant was targeting and the Pueblo Police executing the search warrant knew this, as is evidenced by the police having photographs of the suspect;

   c) It was unlawful for Defendants to arrest or detain Plaintiff William Duran incidental to the execution of a warrant to search for evidence at 1002 Bohmen Avenue;

d) Plaintiff William Duran was compliant with the orders of the police officers and acted peacefully at all times;

e) Plaintiff William Duran made no efforts to resist arrest;

f) Plaintiff William Duran informed Defendant Torres of his disability while she was using excessive force on him;

g) Plaintiff William Duran was handcuffed and was not able to create risk to the police or public when the excessive force was used against him; and

h) Although Plaintiff Deborah Duran was also with her husband at the home, they were outnumbered by the officers, and there was no threat of force or violence by either Plaintiff.

135) The search, seizure, arrest and/or detention of Plaintiff William Duran by Pueblo Police was illegal and violated Plaintiff William Duran's Fourth Amendment rights to be free from unreasonable searches and seizures because:

a) The search warrant for evidence contained no mention that the search was for contraband or objects illegal to possess;

b) There was no evidence, probable cause, or reasonable suspicion that Plaintiff William Duran was doing anything illegal;

c) There was no evidence, probable cause, or reasonable suspicion that Plaintiff William Duran was in possession of contraband or illegal items;

d) There was no evidence, probable cause, or reasonable suspicion that Plaintiff William Duran was involved with criminal activity;

e) Pueblo police were not justified in patting down Plaintiff William Duran; and,

    f)  Pueblo Police were not justified in handcuffing Plaintiff William Duran.

136) The search, seizure, arrest and/or detention of Plaintiff Deborah Duran by Pueblo

Police was illegal and violated Plaintiff Deborah Duran's Fourth Amendment rights to be

free from unreasonable searches and seizures under the circumstances because:

    a)  The search warrant for evidence contained no mention that the search was for

        contraband or objects illegal to possess;

    b)  There was no evidence, probable cause, or reasonable suspicion that Plaintiff

        Deborah Duran was doing anything illegal;

    c)  There was no evidence, probable cause, or reasonable suspicion that Plaintiff

        Deborah Duran was in possession of contraband or illegal items;

    d)  There was no evidence, probable cause, or reasonable suspicion that Plaintiff

        Deborah Duran was involved with criminal activity;

    e)  Plaintiff Deborah Duran was compliant with the Pueblo Police at all times during

        the execution of the search warrant;

    f)  Pueblo police were not justified in patting down Plaintiff Deborah Duran; and,

    g)  Pueblo Police were not justified in handcuffing Plaintiff Deborah Duran.

137) Upon information and belief, Pueblo police officers involved in executing the

search warrant at 1002 Bohmen Avenue had been briefed as to why the search warrant

was issued, and at no time during this briefing were those police officers involved in the

search warrant informed:[20]

---

[20] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

a)  That Plaintiff Deborah Duran was the object of the search warrant;

b)  That Plaintiff Deborah Duran was armed and dangerous; or

c)  That Plaintiff Deborah Duran posed a threat to the safety of the public or the police.

138) The search warrant did not mention or specify anything related to Plaintiff Deborah Duran.

139) There was no arrest warrant for Plaintiff Deborah Duran which was being executed along with the search warrant.

140) The Pueblo Police knew upon having visual contact with Plaintiff Deborah Duran, that she was "obviously" not Timothy Tafoya, as she and Timothy Tafoya do not look alike and are not even in the same age range.[21]

141) At the moment of visual contact with the Plaintiff Deborah Duran, it was reasonable for all the Pueblo police officers at the scene to know that Plaintiff Deborah Duran was not Mr. Tafoya and that Plaintiff Deborah Duran was not implicated in the murder of Mr. Muniz.

142) The search warrant did not specify Plaintiff Deborah Duran as a target of the search warrant.

143) At the time that the police officers executed the search warrant, they did not have probable cause to believe that any person found on the premises of the home at 1002 Bohmen Avenue would be violating the law.

---

[21] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

144) Police officers at 1002 Bohmen Avenue did not recognize Plaintiff Deborah Duran and had no reason to believe that Plaintiff Deborah Duran had committed, was committing, or was about to commit any offense under state or federal law.

145) Plaintiff Deborah Duran made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers.

146) Plaintiff Deborah Duran was handcuffed behind the back.

147) The detention of Plaintiff Deborah Duran, incidental to the execution of a search warrant for evidence, and without cause or suspicion of the Plaintiff Deborah Duran being involved in any illegal activity, was unconstitutional and violated Plaintiff Deborah Duran's Fourth Amendment rights.

148) After Plaintiffs were released from their handcuffs, Defendant Fillmore apologized to them for the "inconvenience."

149) The search, seizure, arrest and/or detention of Plaintiff Deborah Duran was unreasonable under the circumstances because:

a) The police had already identified Mr. Tafoya as a "person of interest" in the murder of Ricky Muniz, had him under surveillance, and could monitor his location electronically through an ankle monitor Mr. Tafoya was wearing;

b) Mr. Tafoya was the real target of the search warrant;

c) Plaintiff Deborah Duran was clearly not the suspect which the search warrant was targeting and the Pueblo police executing the search warrant knew this, as is evidenced by the police having photographs of Mr. Tafoya.;

d) The search warrant was for evidence only;

e) The search warrant did not list contraband as the object of the search;

f) It was unlawful for Defendants to arrest or detain Plaintiff Deborah Duran incidental to the execution of a warrant to search for evidence at 1002 Bohmen Avenue;

g) The decision to use and the use of the S.WA.T. unit were objectively unreasonable.

h) The search warrant was not issued for Plaintiff Deborah Duran;

i) Plaintiff Deborah Duran was compliant with the orders of the police officers and acted peacefully at all times with the Pueblo Police; and,

j) Plaintiff Deborah Duran made no efforts to resist arrest.

150) Although Plaintiff William Duran was also with his wife at the home, they were outnumbered by the officers, and there was no threat of force or violence by either Plaintiff William Duran or Plaintiff Deborah Duran.

151) Even if Defendant Fillmore did not know of the unconstitutional arrest and/or detention of Plaintiff Deborah Duran, Defendant Fillmore as the supervisor of the Pueblo Police Team which was executing the warrant on 1002 Bohmen Avenue, showed a callous indifference to the constitutional rights of Plaintiff Deborah Duran by failing to know what his subordinates were doing.

152) As a direct result of the actions by Pueblo police officers in arresting and/or detaining Plaintiff Deborah Duran, actions taken by Pueblo police under the direct

supervision and express or implicit direction of Defendant Fillmore, Plaintiff Deborah Duran was denied her constitutional rights under the 4th Amendment.

153) The actions and statements of Defendant Fillmore to Plaintiff William Duran show a callous indifference to the rights of not only Plaintiff William Duran, but also Plaintiff Deborah Duran.

154) Mr. Tafoya was subsequently arrested and charged with Second Degree Murder in the death of Mr. Muniz.

155) Mr. Tafoya was convicted on or about November 16, 2016 by his guilty plea to Manslaughter in the death of Mr. Muniz.

## Damages Suffered by Plaintiff William Duran

156) As a direct and proximate result of the acts of Defendants Torres and Fillmore, Plaintiff William Duran suffered the following injuries, harms and losses:

a)  Violation of his constitutional rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures and excessive use of force, and his rights under the Fourteenth Amendment.

b)  Loss of his physical liberty, property and privacy interests including his sense of security and individual dignity;

c)  Loss of enjoyment of life;

d)  Physical injury of both a temporary and permanent nature;

e)  Physical pain and suffering, emotional pain and suffering, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress; and,

f)  Past and future medical and rehabilitation expenses.

157) Plaintiff William Duran was and is in a great deal of pain after being excessively forced to bend his surgically repaired back in an unnatural position, with his arms above his head in an unwarranted and unreasonable manner by Defendant Torres on September 18, 2015.

158) On September 19, 2015 Plaintiff William Duran was evaluated and rendered treatment at Parkview Medical Center in Pueblo for back pain resulting from the injuries he suffered on September 18, 2015.

159) On September 25, 2015 Plaintiff William Duran underwent imaging studies with the Denver VA Medical Center.

160) On February 16, 2016 Plaintiff William Duran was diagnosed with lumbago, with a slipped disc by Dr. Michael R. Stone after an MRI study was performed.

161) Dr. Stone compared the imaging studies performed on Plaintiff William Duran from July of 2012 with the imaging studies performed on Plaintiff William Duran after being injured by Pueblo Police in September of 2015.

162) The results of the comparison by Dr. Stone showed:

    a)  A mild facet hypertrophy at the upper lumbar levels.

    b)  L3/L4 minimal disc bulge with little change from previous studies.

    c)  L4/L5 extensive postoperative change at L4 with resection of the spinous process or portions of it and each lamian. There is moderate to severe bilateral facet hypertrophy and minimal deformity of the bilateral L4 never roots.

d) L5/S1 minimal retrolisthesis of the L5 relative to the S1. There is a 4 x 2 mm
recurrent disc fragment located anterior left paramedian. On sagittal postcontrast
images there is some peripheral enhancement.

e) Impression: Postop changes from the inferior L3-L5 and small recurrent disc to
the left of midline at L5/S1.

f) The diagnosis was a vertebrate abnormality which required medical attention.

163) On April 13, 2016 Dr. Laura Coats examined Plaintiff William Duran and asked
Plaintiff William Duran to schedule trigger point injections of the Plaintiff William Duran's
lover back.

164) On April 25, 2016 Dr. Muhammad Javed performed trigger point injections on
Plaintiff William Duran to relieve a diagnosis of myofacial pain syndrome.

165) On May 2, 2016 Dr. Javed reported the trigger point injections provided no pain
relief and scheduled Plaintiff William Duran for a lumbar MBB.

166) On June 16, 2016 Plaintiff William Duran underwent a diagnostic and medial
branch facet injections, L4-5, L5-S1, left side, under fluoroscopic guidance, procedure
by Dr. Muhammad Javed to treat a diagnosis of lumbar spondylosis and possibly facet
medial pain. During this procedure, Dr. Javed noted a free fragment in the L5-S1 which
he described as an underlying degenerative change from previous surgeries and
considered that Plaintiff William Duran may need to be consulted for neurosurgery.

167) The free fragment was not present after Plaintiff William Duran's surgery which
occurred prior to September 18, 2015.

168) The fragment is a result of the excessive force used by Defendant Torres.

169) The fragment is still present and continues to be a source of pain which limits the activities of Plaintiff William Duran and the pain also decreases Plaintiff William Duran's overall standard of life.

170) Plaintiff William Duran has suffered permanent injury because of the excessive force used by Defendant Torres upon him.

171) Plaintiff William Duran has suffered past medical expenses and will incur future medical costs because of the excessive force used by Defendant Torres upon him.

172) Plaintiff William Duran also suffered loss of liberty, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress because of his illegal arrest and/or detention and the use of excessive force upon him as described above and he continues to suffer humiliation, embarrassment, inconvenience, mental and emotional anguish and distress.

## Damages Suffered by Plaintiff Deborah Duran

173) Plaintiff Deborah Duran did not suffer any physical injuries because of her illegal seizure, but she suffered loss of liberty, humiliation, embarrassment, inconvenience, mental and emotional anguish and distress and continues to suffer from humiliation, embarrassment, inconvenience, mental and emotional anguish and distress.

## CAUSES OF ACTION

### Count One

### Plaintiff William Manuel Duran Against Defendants Fillmore and Torres

42 U.S.C. § 1983: Violation of Fourth Amendment Right to be Free from

Unreasonable Searches and Seizures

174) Plaintiff William Manuel Duran incorporates by reference paragraphs 1 – 172
above as if fully set forth herein.

175) Defendants Torres and Fillmore violated Plaintiff William Duran's rights under the
Fourth Amendment to the US Constitution to be free from unreasonable searches and
seizures.

176) As a direct and proximate result of the violations of Plaintiff William Duran's Fourth
Amendment rights by Defendants Fillmore and Torres, Plaintiff William Duran has
suffered damages, including litigation expenses and attorney fees, and other
compensatory damages, as described above, in an amount to be determined by a jury
and the Court.

### Count Two

### Plaintiff Deborah Duran Against Defendants Fillmore, Torres and/or Ramos

42 U.S.C. § 1983: Violation of Fourth Amendment Right to be Free from

Unreasonable Searches and Seizures

177) Plaintiff Deborah Duran incorporates by reference paragraphs 1 – 155 and 173 as
if fully set forth herein.

178) Defendants Fillmore, Torres and/or Ramos violated Plaintiff Deborah Duran's
rights under the Fourth Amendment to the US Constitution to be free from unreasonable
searches and seizures.

179) As a direct and proximate result of the violations of Plaintiff Deborah Duran's
Fourth Amendment rights by Defendants Fillmore, Torres and/or Ramos, Plaintiff
Deborah Duran has suffered damages, including litigation expenses and attorney fees,
and other compensatory damages, as described above, in an amount to be determined
by a jury and the Court.

## Count Three

## Municipal Liability

180) Plaintiffs incorporate each paragraph of this Complaint as if fully restated here.

181) As described more fully herein, Defendant City is itself liable for the violations of
Plaintiffs' constitutional rights.

### The Chief of Police is a Final Policymaker for Defendant City

182)  The Pueblo Chief of Police is a final policymaker for the City of Pueblo regarding
the enforcement of criminal laws against a suspect and the discipline of officers of the
Pueblo Police Dept.

183) Section 10-3 of the Charter for the City of Pueblo, Colorado states that the chief of
police "shall make rules and regulations with approval of the City Manager and in
conformity with the ordinances and resolutions of the City, concerning the operation of
the Department and conduct of all employees thereof."

184)   The Pueblo City Code, Sec. 1-5-2, states that the City Manager may "[o]verrule administrative staff [and has] the power to set aside any action taken by a department head, and may supersede him or her in the functions of his or her position."

185) The Pueblo City Code, Sec. 1-5-6, requires that department heads, including the chief of police, shall, among other things, "[b]e immediately responsible to the City Manager for the effective administration of his or her respective department and all activities assigned thereto."

186) Sam Azad has been the Pueblo City Manager since January 2013 and continues as the City Manager through the present day.

187) Upon information and belief, Sam Azad is not now and never has been a law enforcement officer.

188) Sam Azad's authority over the chief of police is limited both by his lack of certification as a law enforcement officer and the fact that most enforcement parameters are established by state and federal law and the chief of police, not the City Manager, adopts "policies" modeled after the legal requirements.

189) As of September 18, 2015, there did not exist any rule or regulation made by a Pueblo chief of police that contained any specific standards for the discipline of officers, but the chief supervised discipline of police officers anyway.

190) The Collective Bargaining Agreement Between City of Pueblo and International Brotherhood of Police Officers Local 537 Commencing January 1, 2015 defines a grievance procedure. Step Three of the procedure provides that where a grievant "is not satisfied with the decision of the Chief or his designee, the Union [on the grievant's

Page 35

behalf] may request a meeting with the City Manager or his designee provided that such request is in writing, is signed by the grievant and/or the Union and provided that the request is presented to the Manager or his designee within seven (7) days of the date of the written answer provided by the Chief or his designee."

191) Although the City Manager has supervision and control over the Police Department, and although the chief of police is subject to the City Manager, the City Manager has not meaningfully exercised that supervision or control over the police chief's disciplinary decisions.

192) Although the City Manager has supervision and control over the Police Department, and although the chief of police is subject to the City Manager, the City Manager has not meaningfully exercised that supervision or control over the police chief's decisions regarding the enforcement of the criminal laws of the State of Colorado.

## Customs and Policies of Defendant City

193) Upon information and belief, Defendant City has a practice of investigative shortcomings related to unconstitutional conduct of Pueblo Police Officers.[22]

194) Upon information and belief, Defendant City has a custom and practice of failing to adequately document its law enforcement officers' unconstitutional conduct, sufficient to demonstrate a policy of tolerance and ratification of unconstitutional behavior.[23]

---

[22] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[23] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).

195) Upon information and belief, Defendant City has a practice of failing to adequately

interview law enforcement alleged to have engaged in unconstitutional conduct.[24]

196) Upon information and belief, Defendant City exhibits willful and deliberate

indifference to the constitutional violations committed by its law enforcement because it

fails to investigate allegations of unconstitutional conduct, having the effect of

encouraging unconstitutional behavior. [25]

197) Upon information and belief, Defendant City exhibits willful and deliberate

indifference to the constitutional violations committed by its law enforcement officers

because it fails to require its law enforcement officers to prepare statements when they

are involved in use of force incidents and warrantless arrests. [26]

198) Upon information and belief, the Pueblo Police Department's internal affairs

division had not sustained a single complaint of excessive force and/or false arrest

between 2006 and September 18, 2015[27]

199) Upon information and belief, the overwhelming majority, if not all, of the

investigations of the Pueblo Police Department's internal affairs division into excessive

---

[24] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[25] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[26] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3).
[27] This factual allegation will likely have evidentiary support after a reasonable opportunity for further investigation or discovery. See F.R.C.P. 11(b)(3). See Rehberg v. City of Pueblo, et. al., case 1:10-cv-00261-LTB-KLM, document 81, filed 09/14/11 USDC Colorado that between 2006 and September 14, 2011 that Pueblo Police Department's internal affairs division had not sustained a single complaint of excessive force and/or false arrest.

force and/or false arrest complaints since September 18, 2015 have not been
sustained. [28] [29]

200) Defendant City's conduct of failing to discipline or failing to safeguard against a
known danger establishes an unwritten policy or custom of tolerance of excessive force
and false arrests.

201) Defendant City's notice of misbehavior by its law enforcement officers coupled with
its complete failure to discipline a single police officer after an internal affairs
investigation[30] establishes that Defendant City encourages or condones unconstitutional
behavior by its law enforcement.

202) The Pueblo Police Department's internal affairs division's complete failure to
sustain complaints of excessive force and/or false arrest[31] demonstrates Defendant
City's tacit approval of the Pueblo Police Department's unconstitutional behavior in the
present matter

203) Since the Pueblo Chief of Police is a final policymaker for Defendant City regarding
officer discipline and enforcement of the criminal laws, Defendant City is on notice of the
unwritten policy or custom of tolerance of excessive force and false arrests and the
Pueblo Police Department's tacit approval of unconstitutional behavior in the present
matter.

---

[28] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).
[29] See Rehberg v. City of Pueblo, et. al., case 1:10-cv-00261-LTB-KLM, document 81, filed 09/14/11
USDC Colorado.
[30] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).
[31] This factual allegation will likely have evidentiary support after a reasonable opportunity for further
investigation or discovery. See F.R.C.P. 11(b)(3).

## Defendant City's Failure to Train or Supervise Defendants Fillmore, Torres and/or Ramos

204) Plaintiffs' harms, losses and damages as described above were caused by the policies, practices, and customs of Defendant City in that the City failed to adequately train or supervise Defendants Fillmore, Torres and/or Ramos.

205) As stated above, Defendant City exhibits willful and deliberate indifference to the constitutional violations committed by its law enforcement officers.

206) An officer is only entitled to use force to either prevent the escape of a person who is being arrested or detained, or to protect self, others and property interests. None of those reasons existed to justify the unlawful seizure of Plaintiff William Duran or Defendant Torres' use of excessive force on him, or the unlawful seizure of Plaintiff Deborah Duran. The failure of Defendants Torres and/or Ramos to use justifiable force manifests the failure of Defendant City to adequately train and/or supervise Defendants Torres and/or Ramos.

207) Further evidence of Defendant City's failure to train and/or supervise Defendant Torres is her failure to communicate with the Plaintiff William Duran, warn Plaintiff William Duran of a pending use of force or otherwise take any action adequate to determine the non-violent intentions of Plaintiff William Duran prior to his use of force against him.

208) Defendant Torres' use of excessive force in this case is also evidence that she has not been adequately trained and/or supervised by the Pueblo Police Department on how to recognize circumstances when force is required.

209) Plaintiff William Duran's injuries were caused by the policies, practices, and customs of Defendant City, as described above. As a direct and proximate result of the Defendants' violations of Plaintiff William Duran's constitutional rights, Plaintiff William Duran has suffered damages, including medical expenses, litigation expenses and attorney fees, loss of liberty, and other compensatory damages, and humiliation, embarrassment, inconvenience, mental and emotional anguish and distress, in an amount to be determined by a jury and the Court.

210) The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Pueblo Police Dept. and Defendant City, could exist because municipal policymakers, such as the chief of police, with authority over the same, exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices could flourish because the Pueblo Police Department and Defendant City declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers, such as Defendant Torres and/or Ramos for use of excessive force or for Defendant Fillmore for falsifying case notes and for his supervision over other officers, including the S.W.AT. unit, before and during the raid of 1002 Bohmen Avenue.

211) The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case, and directly and proximately caused Plaintiffs to suffer the harms, losses and damages set forth above

# DEMANDS FOR RELIEF

212) Plaintiffs respectfully request judgment as follows:

    a)  In favor of Plaintiffs and against Defendants,

    b)  In a total amount of damages to be determined at trial, plus costs,

    c)  interest from September 18, 2015,

    d)  attorney's fees as allowed by 42 U.S.C. §1988,

    e)  and such other and further relief as the Court deems just and equitable.

# JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on the issues raised in this Complaint.

DATED this 18th day of September, 2017.

Respectfully Submitted,

s/ Matthew S. Martin
Matthew S. Martin
Gordon Melun Maton, LLC
5500 E. Yale Ave., #300
Denver, Colorado 80222
Tel: 303-756-0800
Fax: 303-756-9315
Email: mmartin@gorlaw.com
Attorney for Plaintiffs William Manuel Duran
and Deborah Duran

Plaintiffs' address:
1004 Bohmen Ave., Pueblo CO 81004